IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES POSTAL SERVICE,

    Plaintiff,

v.

CITY OF BERKELEY,

    Defendant.

No. C 16-04815 WHA

**ORDER DENYING MOTION TO DISMISS**

## INTRODUCTION

In this action by the United States Postal Service to declare unlawful and enjoin the application of a zoning ordinance enacted by the City of Berkeley, the City moves to dismiss. The motion is **DENIED**.

## STATEMENT

The following facts are taken from the complaint. The USPS owns and operates the Berkeley Main Post Office at 2000 Allston Way in Berkeley, California. In 2012, the USPS decided to reduce costs by selling that post office and moving to a smaller location. From 2012 to 2013, the USPS solicited community engagement and public comment on its decision.

The Berkeley City Council opposed the planned sale. The council adopted a formal resolution of its opposition on March 5, 2013, and sent a letter conveying the same to the USPS on April 30, 2013. On July 18, 2013, the USPS issued a Final Determination affirming its decision. In October 2013, the USPS began marketing the post office for sale. From December

2013 to November 2014, in preparation for the sale, the USPS conferred with the City and other groups to negotiate safeguards for the post office's historic status. The USPS and the City were unable to reach agreement in these discussions.

On July 8, 2013, Councilmember Jesse Arreguín wrote a letter to the USPS that read in part (Dkt. No. 1 Exh. 2):

> I am writing to inform you that the Berkeley City Council is considering zoning changes to the area where the Berkeley Main Post Office is located, including the post office site.
>
> . . .
>
> I have submitted the attached item which would establish a Civic Center District zoning overlay. . . . The proposed zoning restrictions reflect the current uses of the property and would ensure that . . . the Berkeley Main Post Office building could only be used for a civic or community-oriented use . . . .
>
> Given that USPS is in the process of considering the potential sale of the Berkeley Main Post Office Building, I wanted to bring this to your attention, since the proposal would change the allowable zoning for the property, and would affect what a buyer could do with the property if the building was sold.
>
> I also want to take this opportunity to reiterate the Berkeley City Council's strong opposition to the sale of the Berkeley Main Post Office and our interest in working with USPS to find solutions to address USPS's financial challenges while keeping the building as a post office.

Discussing the proposed zoning change during a council meeting on January 28, 2014, Councilmember Susan Wengraf stated, "I am very much in favor of saving the Post Office," and Councilmember Max Anderson commented that "to not go ahead and pursue this overlay . . . would be disarming ourselves in the middle of a battle" to "defend . . . that building and the purposes for which it was originally designed." In a local newspaper, Mayor Tom Bates also stated, "There is general agreement on the council that we would like to save the Post Office, and this is a good way to do it . . . . The civic center overlay . . . can be easily described as 'help save the post office.'"

On September 9, 2014, the council passed Berkeley Municipal Code Chapter 23E.98, Civic Center District Overlay (the "Overlay"), restricting nine parcels of land, including the post office, to civic or nonprofit uses. Prior to the Overlay, the affected areas were zoned to

permit residential, retail, and other commercial uses. According to the USPS, the Overlay "eliminated virtually all commercially viable uses" of the post office (Dkt. No. 1 at 8). Moreover, the "practical effects of the [Overlay] have fallen only on the [post office], while commercial activity has continued in and around other parcels subject to the [Overlay]" (*id.* at 9).

On September 22, 2014, the USPS entered into an agreement to sell the post office to developer Hudson McDonald LLC. The Overlay went into effect on September 30, 2014, and the developer was unable to negotiate relief from its effects with the council. On November 5, 2014, the City also sued the USPS to enjoin the sale. *City of Berkeley v. U.S.P.S.*, No. 3:14-cv-04916-WHA (Case No. 14-4916). The developer terminated the sale agreement on December 3, 2014.

The USPS alleges the Overlay "rendered the [post office] unattractive to commercial developers," "depressed the market price [it] otherwise could yield," and "dissuaded the [USPS] from relisting [the post office] for sale," thereby "imped[ing] its efforts to carry out its responsibilities under the Postal Reorganization Act" (Dkt. No. 1 at 9–10). The USPS seeks declaratory and injunctive relief on the bases that the Overlay (1) violates the Supremacy Clause and (2) is preempted by the Postal Clause, Property Clause, and Postal Reorganization Act.

**ANALYSIS**

The City moves to dismiss, contending (1) the action is unripe, (2) the action is time-barred, and (3) the complaint fails to state a claim for relief because the Overlay has only an indirect effect on the USPS.

**1.    RIPENESS.**

Ripeness has both a constitutional and a prudential component. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc). "The constitutional ripeness of a declaratory judgment action depends upon 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment.'" *United States v. Braren*, 338 F.3d 971, 975 (9th Cir. 2003) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). The prudential component of ripeness, moreover, requires federal courts to consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

This action is ripe for adjudication. The facts alleged here show a "substantial controversy" between the parties because, according to the USPS, the Overlay effectively prevents the USPS from selling its post office in violation of the Supremacy Clause. This obstruction is active and ongoing since the USPS alleges that, despite its need to sell the post office, it is "dissuaded" from attempting to do so because the Overlay "eliminated virtually all commercially viable uses of the [post office]" (Dkt. No. 1 at 8–10). And, insofar as the USPS is unable to reduce costs by selling the post office as planned (*id.* at 3–4), withholding of court consideration would impose hardship on the USPS.

The City insists the action is unripe because the USPS "currently has no plans to sell the [post office]" (Dkt. No. 11 at 4–5). The City points out that the undersigned previously dismissed as moot the City's own lawsuit to enjoin the USPS's attempted sale in 2014 because (1) the developer terminated the sale agreement and (2) the USPS rescinded the 2013 final determination, such that any future decision to relocate will be a whole new process. Case No. 14-4916 (Dkt. No. 56 at 4). Since the USPS is not currently taking any steps to sell the post office, the City reasons, the instant action is unripe inasmuch as the City's prior lawsuit is moot (Dkt. No. 11 at 5–8).

The City's reasoning is flawed. Its prior lawsuit dealt with a specific attempted sale to Hudson McDonald that became moot because the developer cancelled the deal. In contrast, the broader controversy here concerns whether the Overlay frustrates *any* attempt by the USPS to sell the post office. These are fundamentally different questions. The gravamen of the USPS's complaint is precisely that the Overlay prevents any potential steps towards sale. The City would demand as a prerequisite for ripeness the very outcome it is accused of precluding. The

4

1  USPS seeks redress, not for interference with any *actual* attempt to sell the post office, but for
2  interference with its ability to even attempt to find a buyer (*see* Dkt. No. 20 at 8–12). Its claims
3  for relief on that basis are ripe.*

### 2. TIMELINESS.

The City in its motion argues that Section 65009(c)(1)(B) of the California Government Code, which imposes a 90-day statute of limitations for challenging a zoning ordinance, bars this action (Dkt. No. 11 at 9). This order does not address this contention because the City has since abandoned it, as confirmed by the City's counsel during oral argument.

### 3. SUFFICIENCY OF THE PLEADING.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when there are sufficient factual allegations to draw a reasonable inference that the defendant is liable for the conduct alleged. A court "must take all of the factual allegations in the complaint as true" but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ibid.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

#### A. Supremacy Clause.

The USPS styles its first claim as anchored in the Supremacy Clause, contending "The Supremacy Clause prevents a municipality from regulating federal functions, even . . . indirectly, through regulation of a third party" (Dkt. No. 20 at 17). Though the USPS does not identify it as such, its argument appears to reference the intergovernmental immunity doctrine — under the Supremacy Clause, the federal government's activities are free from state regulation, so a state regulation is invalid "if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir.

---

* Contrary to the City's contention, concluding that the USPS's instant action to vindicate its ability to sell the post office is ripe does not compel the further conclusion that the City's previous lawsuit regarding the specific attempted sale to Hudson McDonald in 2014 — which fell through and has no prospect of revival — "is no longer moot" (*see* Dkt. No. 22 at 2).

5

2014).  Here, the USPS does not contend it is directly regulated by the Overlay.  Rather, the crux of the USPS's argument is that the Overlay "was *not* enacted as a general land use regulation, but, instead, was targeted, specifically to prevent the sale of the [post office]," *i.e.*, to affect only the USPS and potential purchasers with whom it might deal (*see* Dkt. No. 20 at 19).

On one hand, the Supreme Court has recognized that "a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself," and must be "imposed on some basis unrelated to the object's status as a Government contractor or supplier, [*i.e.*,] imposed equally on other similarly situated constituents of the State" to avoid discriminating against the federal government.  *North Dakota*, 495 U.S. at 437–38.  On the other hand, "A state provision that appears to treat the Government differently on the most specific level of analysis may, in its broader regulatory context, not be discriminatory."  The state "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them."  *Id.* at 438 (quotations omitted).

Here, the City urges, these principles defeat the USPS's claim because the Overlay "applies equally to all private parties within the overlay area regardless of their connection to the Postal Service (or lack thereof), and in its 'broader regulatory context' is squarely grounded on the prior designation of the Civic Center Historic District" (Dkt. No. 11 at 15).  The USPS responds that the Overlay (1) was enacted with discriminatory intent per the contemporaneous statements of City officials, (2) covers an area of such irregular shape that it belies any suggestion of legitimate purpose, and (3) permits other businesses within the Overlay's area of effect to conduct commercial activity inconsistent with the Overlay (Dkt. No. 20 at 5, 19–20).  Importantly, the complaint alleges the "practical effects of the [Overlay] have fallen only on the [post office]" (Dkt. No. 1 at 9).

As to the issue of discriminatory intent, the City cites *United States v. O'Brien* for the proposition that courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive" (Dkt. No. 22 at 4).  391 U.S. 367, 383 (1968).  The City also cites *RUI One Corp. v. City of Berkeley*, wherein our court of appeals concluded facts

6

1    "introduced solely to establish a supposed nefarious motive on behalf of the City Council . . .
2    are wholly irrelevant . . . as our analysis of the constitutionality of an ordinance must proceed
3    from the text of the ordinance, not the alleged motives behind it." 371 F.3d 1137, 1146 n.7 (9th
4    Cir. 2004) (citing *Golden State Transit Corp. v. City of Los Angeles*, 686 F.2d 758, 761 (9th Cir.
5    1982) (quoting *O'Brien*, 391 U.S. at 383)).

6    These decisions indicate that allegations of legislative motive behind the Overlay's
7    passage would not suffice to establish unconstitutionality. The USPS's theory that the Overlay
8    discriminates against the government and those with whom it deals does not, however, rest on
9    allegations that some City officials made statements to that effect. As stated, the USPS also
10   alleges such discrimination is evidenced by the practical effects of the Overlay itself.

11   Indeed, *O'Brien* expressly acknowledged that "the inevitable effect of a statute on its
12   face may render it unconstitutional." *O'Brien*, 391 U.S. at 384–85; *see Gomillion v. Lightfoot*,
13   364 U.S. 339, 341–42 (1960); *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250–51 (1936). Thus,
14   in *Gomillion*, a complaint survived dismissal by alleging that the "essential inevitable effect" of
15   redefined municipal boundaries was to deprive the complainants of voting rights based on their
16   race. *Gomillion*, 364 U.S. at 341–42. And, in *Grosjean*, "a deliberate and calculated device in
17   the guise of a tax to limit the circulation of information to which the public is entitled" was held
18   unconstitutional. *Grosjean*, 297 U.S. at 250–51.

19   Similarly, the USPS here alleges the practical *effect* of the Overlay is only to frustrate
20   the USPS's attempt to sell the post office while other commercial use in the area remains
21   unimpeded (Dkt. No. 1 at 9). *O'Brien* thus does not proscribe the USPS's claim, which rests on
22   more than just allegations of "illicit legislative motive." Unlike in *O'Brien*, the complaint here
23   does not ask the Court "to void a statute that is, under well-settled criteria, constitutional on its
24   face, on the basis of what fewer than a handful of [City officials] said about it." *See O'Brien*,
25   391 U.S. at 384. Rather, the USPS also contends the Overlay is "unconstitutional in its effect"
26   (*see, e.g.*, Dkt. No. 34 at 3).

27   The City protests that some factual allegations in the complaint are false or susceptible to
28   different inferences than what the USPS suggests (*see, e.g.*, Dkt. No. 22 at 3–4). Such arguments

cannot be resolved on a motion to dismiss because, for present purposes, the Court must accept the USPS's factual allegations as true. *See Ashcroft*, 556 U.S. at 678. The USPS plausibly alleges that the Overlay effectively discriminates against the USPS and those with whom it deals because its only effect is to frustrate the USPS's attempts to sell the post office. *See North Dakota*, 495 U.S. at 437–38. At this stage, that is sufficient to survive dismissal.

### B. Preemption.

The USPS styles its second claim as anchored in preemption, *i.e.*, the Overlay is preempted because it conflicts with the Property Clause, the Postal Clause, and three provisions of the Act (Dkt. No. 1 at 11). The Property Clause provides that Congress "shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. CONST. art. IV, § 3, cl. 2. The Postal Clause provides that Congress may "establish Post Offices and post Roads." U.S. CONST. art. I, § 8, cl. 7. And the Act, which directs the USPS to "emphasize the need for . . . control of costs to the Postal Service" in "planning and building new postal facilities," 39 U.S.C. 101(g), and "to establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services," 39 U.S.C. 403(b)(3), empowers the USPS to, among other things, "acquire, in any lawful manner, such personal or real property, or any interest therein, as it deems necessary or convenient in the transaction of its business; to hold, maintain, sell, lease, or otherwise dispose of such property or any interest therein; and to provide services in connection therewith and charges therefor." 39 U.S.C. 401(5).

"[S]tate laws are preempted when they conflict with federal law," including when they stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (citations omitted). Under this principle, the USPS argues, our court of appeals in *Flamingo Indus. (USA) Ltd. v. U.S.P.S.* and *United States v. City of Pittsburg* "has found conflict preemption where a state law or local ordinance purported to regulate the [USPS's] activities undertaken pursuant to the [Act]" (Dkt. No. 20 at 21).

1  In *Flamingo Indus. (USA) Ltd. v. U.S.P.S.*, Flamingo's state law claim against the USPS
2 for terminating Flamingo's contract to produce mail sacks was preempted because Section
3 401(3) empowers the USPS "to enter into and perform contracts, execute instruments, and
4 determine the character of, and necessity for, its expenditures."  302 F.3d 985, 996–97 (9th Cir.
5 2002), *reversed on other grounds by* 540 U.S. 736 (2004).  Allowing state law to control the
6 USPS's procurement decisions would have impinged upon the USPS's right to control the
7 character and necessity of its purchases free from state constraint and negated the deferential
8 standard Congress created for federal court review of such decisions.  Thus, our court of appeals
9 held that Flamingo's claim was preempted by federal law.  *Id.* at 997.

10  In *United States v. City of Pittsburg*, a local trespass ordinance that required postal
11 carriers to obtain residents' express consent before crossing their lawns conflicted with federal
12 law authorizing postal carriers to cross lawns unless the owner affirmatively objects.  661 F.2d
13 783, 785–86 (9th Cir. 1981).  Moreover, the ordinance clearly "frustrate[d] a major
14 Congressional objective" to "promote the efficiency of mail delivery by permitting postal
15 carriers to take short-cuts across lawns."  In light of this clear conflict and interference with
16 "postal carriers' federal duty to deliver the mail efficiently," our court of appeals held the
17 ordinance unconstitutional.  *Ibid.*

18  The conflict in our case seems less clear but remains clear enough to survive dismissal.
19 The statutes cited by the USPS essentially give it powers to obtain, operate, and dispose of postal
20 property.  As to alleged interference with the USPS's ability to obtain or operate postal property,
21 the complaint seems weak, essentially boiling down to some indirect effect on the USPS's
22 overall ability to "reduce costs" (Dkt. No. 1 at 3–4).  The complaint seems stronger, however, as
23 to the USPS's ability to *dispose* of postal property (and this remains the focus of the USPS's
24 argument) (*see* Dkt. Nos. 1 at 1, 3, 10; 20 at 1, 12, 14, 16, 18).

25  The City argues that, even if the USPS is entitled to sell the post office, it is not entitled
26 to sell it on any particular terms, including what the USPS deems a good market price (*see* Dkt.
27 No. 11 at 12).  Neither the Property Clause nor Section 401(5), according to the City, makes any
28 guarantees regarding the conditions under which the USPS might dispose of postal property.  At

1  this stage, however, the USPS has not resorted to such a sweeping argument. Its complaint is not
2  merely that the Overlay created suboptimal market conditions, but rather that the Overlay made
3  the post office in question so unattractive commercially that it effectively frustrates *any* attempts
4  by the USPS to sell (*see* Dkt. No. 1 at 8–10).

5  To be clear, the USPS does *not* theorize that *any* interference in the government's efforts
6  to sell property, even material interference, would be preempted by the Property Clause and
7  Section 401(5) of the Act. Rather, the USPS's theory is that the particular interference caused by
8  the Overlay is so potent as to be effectively equivalent to a total frustration of the USPS's ability
9  to dispose of its property — and thus preempted by federal laws that expressly empower the
10  USPS to do just that.

11  A similar theory prevailed in *Clean Air Mkts. Grp. v. Pataki*, wherein a plaintiff
12  advocacy group challenged a New York law preempted by the Clean Air Act. 338 F.3d 82 (2d
13  Cir. 2003). Title IV of the Clean Air Act Amendments of 1990 implemented a "cap-and-trade"
14  system allocating a certain number of allowances per year to electricity-generating utilities for
15  sulfur dioxide emissions. The system permitted the sale of unneeded allowances, thereby
16  creating a financial incentive for utilities to reduce their emissions. *Id.* at 83–84. The challenged
17  New York law, however, assessed an "air pollution mitigation offset" upon any New York utility
18  that sold or traded its allowances to upwind states. The assessment, which equaled the amount
19  the utility received in exchange for its allowances, applied regardless of whether the allowances
20  sold directly to an upwind state or sold to someone else and subsequently transferred there. *Id.*
21  at 84.

22  The Second Circuit held the New York law preempted, noting that it "[did] not
23  technically limit the authority of New York utilities to transfer their allowances [but] clearly
24  interfere[d] with their ability to effectuate such transfers" in two ways. *First*, the law effectively
25  banned sales of allowances to upwind states by "requiring utilities to forfeit one hundred percent
26  of their proceeds from any [such] sale." *Second*, because utilities had to sell allowances with
27  restrictive covenants to avoid assessments for subsequent transfers to upwind states, and such
28  covenants "indisputably decrease[d] the value of the allowances," the law restricted or interfered

10

with allowance trading under the "nationwide allowance trading system" that was "an essential element of Title IV." *Id.* at 88–89.

Here, the USPS at least plausibly alleges the Overlay effectively bans the sale of the post office — just as the New York law in *Pataki* effectively banned sales of emissions allowances — by "eliminat[ing] virtually all commercially viable uses of the [post office]," which makes it "unattractive to commercial developers" and decreases its value (*see* Dkt. No. 1 at 8–10). As an effective ban on the sale of the post office, the Overlay would obstruct the Act's objective of controlling costs to the USPS by, among other things, empowering the USPS to dispose of real property and directing it to "maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, *consistent with reasonable economies of postal operations*, have ready access to essential postal services." *See* 39 U.S.C. 101(g), 401(5), 403(b)(3) (emphasis added). These allegations are sufficient to survive dismissal.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is **DENIED**.

**IT IS SO ORDERED.**

Dated: January 12, 2017.

WILLIAM ALSUP  
UNITED STATES DISTRICT JUDGE

11