IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES POSTAL SERVICE,

Plaintiff,

v.

CITY OF BERKELEY,

Defendant.

No. C 16-04815 WHA

**ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## INTRODUCTION

The United States Postal Service brought this action to declare unlawful and enjoin the application and enforcement of a zoning ordinance enacted by the City of Berkeley. This order sets forth findings of fact and conclusions of law after a one-day bench trial.

## PROCEDURAL HISTORY

The United States Postal Service brought this action against the City of Berkeley based on allegations that the City enacted an unconstitutional zoning ordinance for the improper purpose of preventing the sale of the Berkeley Main Post Office at 2000 Allston Way in Berkeley, California. The complaint asserts two claims under the Supremacy Clause, one based on intergovernmental immunity and the other based on conflict preemption. After prior orders denied the City's motion to dismiss (Dkt. No. 43) and the parties' cross-motions for summary judgment (Dkt. No. 145), both sides stipulated to try this case on the summary judgment record based on the Court's own factual evaluation thereof (Dkt. Nos. 150–52). This action then

proceeded to a one-day bench trial comprising only closing arguments. In addition to the summary judgment record and closing arguments, the trial record includes each side's proposed findings of fact and conclusions of law, as well as the responses thereto (Dkt. Nos. 163–66).

Rather than merely vet each and every finding and conclusion proposed by the parties, this order navigates its own course through the evidence and arguments, though many proposals by the parties have found their way into this order. Any proposed finding of fact expressly agreed to by the opposing side at least in part shall be deemed adopted to the extent agreed upon, even if not expressly stated herein. It is unnecessary for this order to reach every proposed finding and conclusion, or to cite the record for every finding herein. Citations to the record are provided only as to particulars that may assist the court of appeals. All declarative statements herein are factual findings.

**FINDINGS OF FACT**

1. The post office at the center of this case was built in 1914 and has been owned and used as a post office by the USPS since the 1930s. It resides in the City's Civic Center Historic District, nine parcels of land in a five-block area organized around Civic Center Park.

2. The Civic Center Historic District was initially planned in 1899 and largely completed by 1950. By 1998, it had achieved local, state, and federal recognition as a historic district. The same year, the National Register of Historic Places described it as "a clearly defined civic center" and "cohesive ensemble" that "required more than three decades of planning and land acquisition to achieve" and "retains a high degree of integrity" in appearance (Dkt. No. 12-5). Although that description was written approximately two decades ago, it remains accurate today, as the undersigned judge personally witnessed when he conducted a view of the area with the parties' assistance (*see* Dkt. No. 49).

3. In 2012, the USPS, facing a financial crisis that jeopardized its statutory mission, decided to reduce costs by selling the post office and consolidating operations at a smaller location. The Berkeley City Council opposed the planned sale and adopted a formal resolution to that effect in March 2013. At the time, the City itself owned five of the nine parcels in the Civic Center Historic District, with the post office, Berkeley Unified School District, and

2

Downtown Berkeley YMCA accounting for the remaining four parcels. Though zoning designations for the area permitted residential, office, and other commercial uses, the buildings remained dedicated to civic and community functions like governmental, educational, and social services.

4. In 2013, the USPS affirmed its decision to sell the post office, and its broker began marketing the post office for sale. The USPS and the City have attempted to negotiate safeguards for the post office's historic status, but have been unable to reach agreement.

5. By February 2014, the USPS had received five offers for the post office, including from the YMCA, Tibetan Nygingmapa Meditation Center, and Hudson McDonald, a developer that intended to turn most of the post office to commercial use as, for example, a Target store. In September 2014, the USPS agreed to sell the post office to Hudson McDonald for nine million dollars but intended to lease back the front portion of the building for retail postal operations.

6. Also in September 2014, the council passed Berkeley Municipal Code Chapter 23E.98, Civic Center District Overlay (the "Overlay"). The Overlay restricted the entire Civic Center Historic District — including the post office — to civic, nonprofit, cultural, and other similar uses, for the professed purpose of preserving the integrity of the area and protecting its cultural and historical heritage.[1]

7. The reach of the Overlay remains coterminous with the boundaries of the Civic Center Historic District. Other historic properties and districts appearing in the National Register of Historic Places exist elsewhere in the City, but the Overlay does not reach them.

8. After the council passed the Overlay, Hudson McDonald asked the USPS for additional time to try to work out a solution with the City that would permit its proposed commercial use of the post office. The USPS refused, and in December 2014, Hudson McDonald terminated its sale agreement to preserve the deposit it had previously paid.

---

[1] On November 5, 2014, the City also sued the USPS to enjoin the sale. *City of Berkeley v. USPS*, Case No. 3:14-cv-04916-WHA (dismissed as moot in April 2015).

3

9. By its terms, the Overlay applies equally to all properties within the Civic Center Historic District. Because all current uses of those properties remain consistent with the Overlay's restrictions, the Overlay has no impact on those uses. The Overlay has no effect on the USPS's own use of the post office.

10. The USPS's own national Manager of Real Estate and Assets admitted that the Overlay does not prevent the USPS from selling the post office, albeit at diminished value. Significantly, the USPS's own hired expert, real estate appraiser Timothy Runde, concluded that the post office retains a market value of over six million dollars — approximately 39% lower than its unconstrained value — even with the Overlay in place. The City's hired expert, real estate appraiser Peter Overton, reached a similar conclusion, estimating the post office's current market value at over seven million dollars with the Overlay in place.

11. The Overlay similarly dampens the sale (or lease) value of every other property within the Civic Center Historic District, since any subsequent purchaser (or renter) of any property therein would find themselves similarly subject to the same use constraints. The post office is not unique in that regard. What seems unique about this situation is merely that, among all the owners of property within the Civic Center Historic District, only the USPS currently intends to sell its property to purchasers who would want to use it for purposes prohibited by the Overlay.

12. To repeat, the Overlay does not prevent the USPS from selling the post office. The USPS nevertheless made no further attempt to negotiate with Hudson McDonald or any other prospective purchaser. Instead, the USPS took the post office off the market entirely and never relisted it for sale.

**CONCLUSIONS OF LAW**

**1.    INTERGOVERNMENTAL IMMUNITY CLAIM.**

With respect to intergovernmental immunity claims, "[a] state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (citation omitted); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014). Here, as stated, all

4

agree the Overlay does not directly regulate or discriminate against the USPS, so the sole issue remains whether or not the Overlay discriminates against those with whom the USPS deals — *i.e.*, future potential purchasers of the post office. To pass scrutiny in this context, the Overlay must "be imposed equally on other similarly situated constituents of the State," since the "State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *North Dakota*, 495 U.S. at 438.

Here, the record is clear that the Overlay's restrictions apply equally to the entire Civic Center Historic District, including the post office. The USPS contends the Overlay nevertheless runs afoul of intergovernmental immunity because it singles out those nine parcels for more stringent regulation than "other historic properties or historic districts in the City" (*see, e.g.*, Dkt. No. 165 ¶ 46). Aside from pointing out that "other historic properties or historic districts in the City" exist, however, the USPS has supplied no evidence or analysis sufficient to show how those other properties and districts could be considered "similarly situated" to the post office in any meaningful sense. There are, after all, innumerable reasons why something might be considered "historic," and things of comparable "historic" value might differ in significant ways that warrant different kinds of regulation. Rather, the USPS's theory seems to be that, for intergovernmental immunity purposes, all properties and districts that remain "historic" in some general sense should be lumped together as "similarly situated constituents." Under this theory, no local regulation could be tailored to address the unique attributes of any "historic" region that happened to include federal property unless it also indiscriminately swept into its ambit all other regions falling under the broad umbrella of "historic" character. The USPS has provided no authority or argument that could justify such an extraordinary result.

The USPS's related argument that the Overlay is discriminatory because it does not cover other properties immediately adjacent to the Civic Center Historic District is similarly meritless (*see, e.g.*, *id.* ¶ 48). The Overlay's stated purpose concerns only the Civic Center Historic District, and consistent with that purpose, its reach remains precisely coterminous with the long-established boundaries of that area. Of course, every "historic district" — or any other discrete area — has to stop somewhere. Its boundaries must end on some block or street. It is

5

nothing more than a truism that any regulation purporting to govern a specific area will affect properties right up to the boundaries of that area but not the properties immediately beyond. The USPS's protestations about this simple fact do nothing to advance its case.

On the other hand, the record contains strong evidence that the nine parcels constituting the Civic Center Historic District remain unified as a "cohesive ensemble" by the unique historic and cultural significance they hold within the City, and this order so finds. And, as stated, the Overlay expressly aims to preserve the aforementioned unique historic and cultural significance of the Civic Center Historic District. Consistent with its stated purpose, the Overlay's reach remains precisely coterminous with the boundaries of that area. This order concludes that, for purposes of determining whether or not the Overlay discriminates against future potential purchasers of the post office, the relevant group of "similarly situated constituents" comprises future potential purchasers of other properties in the Civic Center Historic District.

Even so, the USPS contends, the Overlay violates intergovernmental immunity because, while facially neutral, "its current practical effect falls only on those who would contract with the Federal Government" (*see, e.g.*, *id.* ¶¶ 47, 49). This, despite the fact that any future potential purchaser of any property within the Civic Center Historic District would be subject to the same restrictions under the Overlay. By extension, the practical effect of the Overlay has been to uniformly depress the market value of all properties within the Civic Center Historic District. Other owners of such properties would face challenges in the real estate market similar to those confronting the USPS if they choose to sell or lease their properties. The USPS's theory here seems to be that the Overlay treats it differently because it alone, of all the property owners in the affected area, currently seeks to sell its property. But that difference flows from the USPS's decision, not from the operation of the Overlay. Under the USPS's theory, it would be virtually impossible to impose any local regulation — no matter how objectively or sincerely neutral — on a group of constituents that happened to include the federal government or those with whom it deals, because any deviation in the infinite potential actions and decisions of said constituents might cause the federal government or those with whom it deals to feel the impact

6

of the regulation more keenly than their neighbor and thus violate intergovernmental immunity. Again, the USPS has provided no authority or argument to justify such a sweeping theory.

In short, this order concludes the Overlay imposes the same restrictions on future potential purchasers of the post office that it does on future potential purchasers of other properties in the Civic Center Historic District, and that the Overlay does not treat any "similarly situated constituents" better than it does the USPS or those with whom it deals. The Overlay therefore does not violate intergovernmental immunity.

### 2. CONFLICT PREEMPTION CLAIM.

With respect to conflict preemption claims, "state laws are preempted when they conflict with federal law," including when they stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citations omitted). Relevant here, the Postal Reorganization Act empowered the USPS to, among other things, "hold, maintain, sell, lease, or otherwise dispose of [its] property or any interest therein," and directed the USPS "to establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services." 39 U.S.C. §§ 401(5), 403(b)(3). The USPS contends these provisions preempt the Overlay (*see, e.g.*, Dkt. No. 165 ¶¶ 56–59).[2]

Throughout this litigation, the USPS has repeatedly affirmed it "does *not* theorize that *any* interference in the government's efforts to sell property, even material interference, would be preempted . . . [r]ather, the USPS's theory is that the particular interference caused by the Overlay is so potent as to be effectively equivalent to a total frustration of the USPS's ability to dispose of its property" — in other words, that it "effectively bans the sale of the post office" (*see, e.g.*, Dkt. Nos. 43 at 10–11; 153 at 18:23–19:10, 23:1–16). That remains the theory the USPS must prove. Yet it has failed to do so. Despite some debate over the precise numbers

---

[2] The USPS mentioned other provisions of law in the complaint but has since focused its argument only on these provisions of the PRA. The USPS insists in its last filing that it did not "abandon" reliance on those other provisions because "the PRA is the vehicle" for those provisions (*see* Dkt. No. 166 at 30), but the practical effect is the same. The bottom line remains that the conflict preemption issue boils down to the question of whether or not the Overly totally frustrated the USPS's ability to dispose of its property.

7

between the parties and their hired experts, the record as a whole remains clear that the post office continues to retain considerable value in the real estate market, albeit diminished relative to what it could have commanded without the Overlay. Put differently, the record shows that the Overlay does not totally frustrate the USPS's ability to sell the post office, and this order so finds. This defeats the USPS's conflict preemption theory.

To be clear, although the parties chose to focus on their battle of real estate experts, this important factual dispute did not need to turn on appraisal reports. For example, the USPS could hypothetically have proffered evidence — not merely attorney argument and unsubstantiated insinuation — that something about the grand scheme of its nationwide operational plan makes it impossible, as a practical matter, to sell the post office below a certain price. But it did not do so. The USPS could also hypothetically have proffered evidence that no one would purchase the post office with the Overlay in place, and any efforts to strike a reasonable deal would have been futile. But the USPS did not even try. It simply took the post office off the market and filed this lawsuit instead, thereby foreclosing what might have been persuasive proof of its claim. As the record stands, it seems the USPS would demand not only the ability to sell its property but also the absolute right to sell it to the purchaser and under the conditions of its choosing (*see, e.g.*, Dkt. No. 165 ¶ 59). Contrary to the USPS, this does not merely amount to consistency with "reasonable economies." In the ordinary course of reasonable business dealings and economic realities, no entity — federal government or otherwise — has such unfettered choice. All must cope with the realities of the market, and the reality of the market here is that the Overlay is just one of many factors affecting the value of every property in the Civic Center Historic District in the eyes of future potential purchasers.

One last loose end. The USPS repeatedly references statements by individual legislators in support of its argument that the council enacted the Overlay with the true intent of preventing the sale of the post office. The USPS asserts that this evidence of intent, coupled with the unconstitutional effects of the Overlay, supports its claims. As explained, however, the record does not support any conclusion that the Overlay produced unconstitutional effects. At the very outset of this case, an order recognized that allegations of subjective legislative intent would not

suffice to defeat the Overlay if it proved otherwise constitutional (*see* Dkt. No. 43 at 6–7).  In light of the findings and conclusions herein, the USPS's argument about intent cannot salvage its case.  *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 383 (1968) (courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive"); *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1106 (9th Cir. 2016) (for preemption purposes, "it does not matter if [a state] passed the [challenged laws] for a good or bad purpose"); *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1146 n.7 (9th Cir. 2004) (facts "introduced solely to establish a supposed nefarious motive on behalf of the City Council . . . are wholly irrelevant . . . as our analysis of the constitutionality of an ordinance must proceed from the text of the ordinance, not the alleged motives behind it"); *City of Las Vegas v. Foley*, 747 F.2d 1294, 1296–98 (9th Cir. 1984) (declining to shift focus of constitutional inquiry from "objective manifestations of legislative purpose to the subjective motivations of individual legislators").

**CONCLUSION**

For the foregoing reasons, the USPS has not carried its burden to prove that either intergovernmental immunity or conflict preemption renders the Overlay unconstitutional under the Supremacy Clause.  It has therefore established no entitlement to relief on its claims.  Accordingly, judgment will be entered in favor of the City.

**IT IS SO ORDERED.**

Dated:  May 14, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE